# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

| | |
|---|---|
| United States of America | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:16-MJ-0131 CKD |
| | ) |
| Stephen Cebula | ) |
| *Defendant(s)* | |

**FILED**

JUL 12 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ July 2nd and 3rd _____ in the county of _____ Sacramento _____ in the

_____ Eastern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Transmission of threats in interstate commerce |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Brady Cowan, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___ July 12, 2016 ___

_____
*Judge's signature*

City and state: ___ Sacramento, California ___

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Brady H. Cowan, being duly sworn, do hereby depose and state the following:

### I.    BACKGROUND

1.    On July 11, 2016, in connection with this case, I submitted and swore to an affidavit for a search warrant at 3225 Panama Avenue, Carmichael, California (the "Subject Residence"). I incorporate the facts of that affidavit herein, and attach it as Exhibit A to this affidavit.

### II.    INTERVIEW WITH CEBULA

2.    On July 11, 2016, the Court signed a search warrant authorizing law enforcement to search the Subject Residence for evidence that Cebula has violated 18 U.S.C. § 875(c). Law enforcement executed the search warrant on July 12, 2016, shortly after 6:00 a.m.[1] At the beginning of the search, law enforcement located Cebula, secured him, and provided him with his Miranda rights. Cebula was not under arrest at this time, nor was he in handcuffs at the time of the interview.

3.    After receiving his Miranda rights, Cebula admitted that he sent threats to Blizzard Entertainment through his Facebook account, and made threats to other players while playing the video game "Heroes of the Storm". Cebula said the purpose of the threats was to scare those whom he had threatened. In reference to threatening Blizzard, Cebula told agents that he looked up Blizzard's physical location on Google and mentioned it in the threat to give them a sinking feeling that they should be worried. Cebula also said that he used the term, "opportunistic tools" in his threat to Blizzard to let their minds wander, and included a reference to an AK-47 because it seemed like the scariest weapon.

4.    Cebula also acknowledged that he had threatened fellow players of "Heroes of the Storm" in communications via the game's chat function. Some of these threats concern sexual assaults on young girls, and Cebula said that he has fantasized about violently sexually assaulting children. During the search of the Subject Residence, law-enforcement personnel determined that

---

[1] During the search, law enforcement found two sheds on the property where the Subject Residence is located, which law enforcement had not known about. These sheds are not listed in the search warrant as places to be searched. Law enforcement sought and obtained permission to search the sheds from Cebula's mother, the property owner. Nothing of evidential value was found in them.

three young children live there.  Cebula initially told law-enforcement personnel that he had not fantasized about having sex with any of the children who reside at the Subject Residence, but later stated that he has fantasized about oral sex and sexual intercourse with his five-year-old niece, who resides there.  Cebula had been placed under arrest and told that his <u>Miranda</u> rights still applied when he made this statement about his niece.

5.    In light of the statements Cebula made during the execution of the search warrant and the information learned in this investigation, FBI agents placed Cebula under arrest based on probable cause that he has violated 18 U.S.C. § 875(c).

### III.    CONCLUSION

6.    Based on my training, experience and discussions with other law-enforcement personnel, the facts set forth in this affidavit, and in my prior affidavit, I believe there is probable cause that Cebula has committed violations of 18 U.S.C. § 875(c), and I request that the Court issue a complaint to that effect.

7.    I swear under penalty and perjury that the foregoing information is true and correct to the best of my knowledge, information, and belief.

Brady H. Cowan
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this 12 day of July, 2016.

The Honorable Carolyn K. Delaney
United States Magistrate Judge

Approved as to form:

Owen Roth
Assistant United States Attorney

# **Exhibit A**

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Brady H. Cowan, being duly sworn, do hereby depose and state the following:

### I.   INTRODUCTION AND AGENT BACKGROUND

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI), and have been so employed since September of 2014.  I was trained as an FBI Special Agent at the FBI Academy in Quantico, Virginia.  During my time training in Quantico, Virginia, I received specialized training in the methodology of general law enforcement and white collar and fraud criminal investigations.

2.   I am currently assigned to the FBI's Sacramento Division, and I investigate domestic terrorism in the Eastern District of California and elsewhere.  My responsibilities include investigations of sovereign-citizen extremists, white supremacy extremists, anarchist extremists, militia extremists, eco-terrorists, active-shooter incidents, hate groups, and other violent groups. I have participated in federal investigations involving election fraud, identity theft, wire fraud, fraud against the government, color of law violations, public corruption, and mail fraud.

3.   I have performed law enforcement related tasks such as executing state and federal search and arrest warrants, utilizing confidential sources, issuance of grand jury subpoenas, and surveillance of subjects.  I have been involved in search warrants that involved the search and seizure of financial instruments, computer equipment, and proceeds from crime.

4.   I am a "Federal Law Enforcement Officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal law enforcement agent engaged in enforcing criminal laws and authorized to request warrants.

### II.   PURPOSE AND BASIS OF AFFIDAVIT

5.   This affidavit is submitted in support of an application of a search warrant for evidence and instrumentalities of violations of 18 USC § 875(c).  As set forth below, I have probable cause to believe that such items, as set forth in Attachment B and incorporated herein by reference, are currently to be found at the items at 3225 Panama Avenue, Carmichael, CA, more specifically described in Attachment A, which is also attached hereto and incorporated herein by reference.

6.     The facts set forth in this affidavit are based on the following: my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience.

7.     Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application of a search warrant, it does not set forth each and every fact that others or I have learned during the course of this investigation.

### III.     APPLICABLE LAW

8.     Title 18 U.S.C. § 875(c) makes it unlawful for a person to transmit in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another.

### IV.     STATEMENT OF PROBABLE CAUSE

#### A.     Background

9.     Blizzard Entertainment ("Blizzard") a division of the video-game company Activision/Blizzard, is based in Irvine, California. Blizzard produces and distributes online and network-based video games, such as "Heroes of the Storm." "Heroes of the Storm" is an internet-based video game that operates on computers. Players download software that enables them to access the game on the internet, where they can engage with other players. Players of this game use "avatars", digital characters that they can endow with tools and characteristics, as their means of participating in the game. Players pay fees, using credit cards or PayPal, to purchase enhancements to their avatars.

10.     Cebula resides at 3225 Panama Avenue, Carmichael, California (the "Subject Residence") and is a player of "Heroes of the Storm". This game has a "chat" function that enables players to communicate with each other while playing.

11.     Blizzard informed the FBI that on July 3, 2016, Cebula made statements to other

individuals playing "Heroes of the Storm" while playing the game that caused at least one individual to complain to the company. These statements were recorded in chat logs, which Blizzard has provided to the FBI. Blizzard arrested Cebula's ability to communicate with other players. In response, Cebula transmitted certain statements to Blizzard that the company received outside the State of California.

12. Blizzard's complaint was forwarded to FBI's Sacramento office once it was determined Cebula is a resident of this federal district.

**B.    Identification of Cebula and the Subject Residence**

13. Blizzard's complaint to the FBI concerned the "Heroes of the Storm" player-account associated with the e-mail address "stephencebula@hotmail.com." According to Blizzard, the account was established by Cebula, at the Subject Residence, with a phone number of (916) 487-8026. Purchases on the account were made with a Mastercard in Cebula's name, at the Subject Address.

14. On July 7, 2016, Blizzard provided the FBI with the internet protocol address (the "IP Address") associated with the statements made by user "stephencebula@hotmail.com" on July 2 and 3, while playing "Heroes of the Storm." An internet-protocol address is a location where a computer accesses the internet. According to Blizzard, the IP Address has been used regularly by the player-account in question for the last few months to log into "Heroes of the Storm" and to play the game for several hours a day.

15. On July 8, 2016, the internet service provider that services the IP Address, Consolidated Communications, provided the subscriber information for the IP Address during the time period that the statements were made. According to Consolidated Communications, the subscriber for the IP Address is Gail Cebula, at the Subject Residence, with telephone number (916) 051-1724.[1] This means the computer used to make the statements on the "Heroes of the Storm" gaming platform accessed the internet from the Subject Address.

---

[1] On July 11, 2016, I spoke with Consolidated Communications, who stated that this phone number is not a valid phone number, but it is the only one they have on file.

16. On or about July 8, 2016, FBI agents discovered three social-media accounts believed to be attributable to Cebula.

a)      A Twitter account using the handle @Elvishbardofwoe, last visited on July 8, 2016, lists the user's name as "Stephen J. Cebula" and a location of Sacramento. The Twitter page consists of six tweets; two tweets, both sent on March 10, 2016, ask other Twitter users if they play "Heroes of the Storm."

b)      A Facebook page using the handle "tedbundyismygod1", last visited on July 8, 2016 and was last updated on July 4, 2016, lists Cebula's birthday. In the "About" section of the page, Cebula states that he is an "underling" at "Serialkillers Scanlator," and that the user has studied "Anything and Everything at Serial Killers." This was the account used to send the statements to Blizzard.

c)      A second Facebook page using the handle, "stephen.cebula.5" was last visited on July 8, 2016, and was last updated on June 24, 2016. The profile picture for this account depicts a man who resembles Adolf Hitler playing video games, with the caption, "PRO GAMER. 6.000.000 KILLS, 1 DEATH." The profile is "friends" with the first Facebook profile describe above.

17. A police report from March 2015, shows that Cebula lived at the Subject Address as of that date. According to the report, on March 11, 2015, Cebula called the Sacramento Sherriff's Department communications center and reported that he planned to attack and kill someone at Carmichael Park. When a Sherriff's deputy initially made contact with Cebula, he refused to obey commands and instead balled his fists and took what a deputy described as an aggressive stance toward him. Once other deputies responded, Cebula surrendered to them. He told deputies that he had intended to beat someone to death; he also said multiple times that he would have cut his sister's throat by that point, but would not kill her because she had children. At the time of the contact, Cebula lived with his mother, sister, and his sister's two children. Cebula later stated that he had read many books about killing people, which he felt was his duty. He claimed his intended targets were his sister, overweight people, and various others that did not fit his specific views. Cebula was not charged with any crime during this encounter with the Sacramento Sherriff's Department, though they did place him on a 5150 hold based on his statements to them. Additionally, as a juvenile,

Cebula was charged with one count of threatening a school employee and one count of battery on a school employee with injury.

18.  Between July 5 and July 8, 2016, FBI agents performed surveillance of the Subject Residence, and observed a female child living there, as well as an individual who appeared to match Cebula's description.  Finally, on July 8, 2016, FBI agents and a support employee made a "spoof" call to the phone number for Cebula, and Cebula confirmed it was he when he answered and that he resided at the Subject Residence.

C.   **Statements Made on July 2 and 3, 2016**

19.  According to the complaint received from Blizzard, on July 3, 2016, a player of "Heroes of the Storm" made statements to other players that caused them to complain to the company.  The player, user 83054414#1, was identified as the user of Cebula's gaming account.  Blizzard reported comments to the FBI. [2]  Excerpts of these communications are as follows:

| | | |
|---|---|---|
| 7/3/2016 0:45 | 83054414#1 | Sup you fucking nigger cunt slaves. I swear to you if I find you when I try to hack into your profiles, I will rape your children regardless of age. If we win, I will leave you all alone after I rape them. If not, their throats meet my blade. Let's win. |
| 7/3/2016 0:45 | 83054414#1 | I will fill whatever you stupid niggers need. |
| 7/3/2016 0:46 | 83054414#1 | Shutup nigger. I will tell you when to speak, slave. |
| 7/3/2016 0:47 | 83054414#1 | Yeah ya dumb nigger. |
| 7/3/2016 0:47 | 83054414#1 | way to pay attention. Go back to cotton picking. |
| 7/3/2016 0:47 | 83054414#1 | i hate you all. You make me want to shoot up an elementary school. |
| 7/3/2016 0:48 | 83054414#1 | I will thank you when I stick my dick into your 5 year old girl. |
| 7/3/2016 0:48 | 83054414#1 | If you do not have one, I will wait until you do. |

[2] A complete transcript of the comments provided by Blizzard, which includes responses from other players to Cebula, is attached at Appendix A.

AFFIDAVIT OF BRADY H. COWAN

| | | |
|---|---|---|
| 7/3/2016 0:36 | 83054414#1 | Tell me where you live nigger, and if you are near me, I will kill you. |
| 7/3/2016 0:38 | 83054414#1 | Screen shot this. Something bad may or may not happen to the blizzard headquarters here in california. |
| 7/2/2016 7:17 | 83054414#1 | You suck worse than me nigger. I will kill your family bitchl. |
| 7/2/2016 7:18 | 83054414#1 | I will rape any low age daughters you have then slit their throat bitch. |
| 7/2/2016 7:19 | 83054414#1 | fuck you niggers. I will kill all of you. |
| 7/2/2016 7:19 | 83054414#1 | Tonight, a little girl might get a dick in her because of you nigger slaves. |
| 7/2/2016 7:19 | 83054414#1 | It is your fault. Not mine. |
| 7/2/2016 7:19 | 83054414#1 | I will bomb the new york twin towers. |
| 7/2/2016 7:19 | 83054414#1 | I will kill all the children in disneyland. |
| 7/2/2016 7:19 | 83054414#1 | I swear it. |
| 7/2/2016 7:20 | 83054414#1 | I hate you all. I hate everyone. |
| 7/2/2016 7:22 | 83054414#1 | Hey niggers. I am going to rape a little girl in the bathroom at Disneyland. Let's win this so I can go to bed feeling like the god I am. |
| 7/2/2016 7:23 | 83054414#1 | Or we can lose and I can slit her throat and shove her into the toilet after I am done with her. |
| 7/2/2016 7:17 | 83054414#1 | You suck worse than me nigger. I will kill your family bitchl. |

20. In response to player complaints about the communications, Blizzard suspended Cebula's ability to communicate with other players. The same day, Blizzard received two Facebook messages, one posted to its public account and one sent via Facebook's private communications mechanism. Both messages were from the Facebook account "tedbundyismygod1". Blizzard provided screen shots of the messages to the FBI, and they read as follows:

> **Public Post** 
>
> Careful blizzard... I live in California and your headquarters is here in California... You keep silencing me in Heroes Of The Storm and I may or may not pay you a visit with an AK47 amongst some other "fun" tools.
>
> Yesterday at 19:56 by Stephen Cebula

> **Hidden Post**
>
> You keep silencing people in heroes of the storm and someone who may live in California might be inclined to "cause a disturbance" at your headquarters in California with an AK47 and a few other "opportunistic tools"... It would be a shame to piss off the wrong person. Do you not agree blizzard?
>
> Yesterday at 20:15 by Stephen Cebula

**D.   Interstate Communications**

21.  On July 8, 2016, Peter Ty of Blizzard was interviewed in relation to this investigation. Ty informed me that on July 2, 2016, a Blizzard customer-service representative and company Facebook moderator, based in Austin, Texas, received a complaint ticket generated from the video game "Heroes of the Storm."  The complaint was generated against the account subscribed to by Cebula, based on in-game chat communications from that player.

22.  Ty stated that when a complaint is made, Blizzard reviews the previous twelve to twenty-four hours of chat logs for the reported player.  The customer-service representative accordingly accessed the chat logs described in this affidavit from Austin, Texas, and viewed the messages described above.  He also accessed Blizzard's Facebook account and viewed the posts listed in this affidavit.  The representative performed these functions using a Blizzard computer, in Texas, and did so as part of his normal duties as a company employee in the same manner he handles each complaint he is assigned.

**V.   TRAINING AND EXPERIENCE**

23.  I know from similar investigations detailed above and from information provided to me

by other agents with experience investigating these types of cases, computer video-game software is retained on computers kept in the residences of those who play them.  On or about July 7, 2016, Peter Ty of Blizzard stated that "Heroes of the Storm" requires players to download software to a physical computer, which typically appears as an icon on the desktop.  Ty stated that the game is not web-based, meaning there would be digital evidence of its existence on a computer system.  Here, I believe digital evidence of Cebula's statements to Blizzard and to other players exists on his computers.

24.  I know from similar investigations detailed above and from information provided to me by other agents with experience investigating these types of cases, that individuals use devices called "routers" to connect to the internet.  Further, routers can contain evidence attributing criminal activity to suspects, in that they show the internet-protocol addressed used and the log-in and log-out times of users.  On or about July 8, 2016, Ty stated that the user of the player-account in question has accessed "Heroes of the Storm" from the same IP Address over the last several months, which means the user has used the router tied to the IP Address.

25.  I know from similar investigations detailed above and from information provided to me by other agents with experience investigating these types of online cases, that criminals can access social media sites such as Facebook with smart phones and computers.  Here, FBI has developed evidence tending to show that Cebula has used various social-media sites, such as Facebook and Twitter, to send messages concerning "Heroes of the Storm" and to make the statements at issue.

26.  I know from similar investigations detailed above and from information provided to me by other agents that external media such as thumb drives and hard drives can store entire operating systems, which can include entire applications.  This allows the user to utilize any computer solely for its processer and memory, and to rely on the external media to access programs, including web-based programs.

27.  I know from similar investigations detailed above and from information provided to me by other agents with experience investigating these types of threats that criminals planning attacks often store weapons and incendiary devices at their homes.  Here, Cebula told Blizzard that he will "visit" and "cause a disturbance at" Blizzard's headquarters with an AK-47 and other "fun" and

8

"opportunistic" "tools". I know that an AK-47 is an assault rifle capable of being operated in semi-automatic and/or full-automatic modes, and can fire multiple bullets in a matter of seconds. I also believe, based on my training and experience and my investigation of this case, that Cebula's use of the word "tools" in his statements to Blizzard refers to items capable of wounding and killing people. Cebula has also previously told law enforcement that he has read books about killing people and has felt compelled to kill his sister, overweight people, and people who do not fit with his views.

28. After consultation with other law enforcement officers with experience in investigating crimes against children, I know that those who plan to assault and rape young children often possess physical depictions of similar assaults. In the online statements made by Cebula outlined in Appendix A, Cebula discusses assaulting and raping young children at Disneyland. I know that when people plan to travel to other places, they make travel arrangements, the proof of which can be stored as physical or electronic documents. This could exist in the form of a receipt of an airline ticket, train ticket, rental car, other modes of travel, or route maps. I also know from consultation with other law enforcement officers that those planning attacks often pre plan those attacks by researching the location they plan to attack. This research can include physical, digital, or online brochures, photographs, and maps. I also know from consultation with other law enforcement officers that sometimes those planning attacks do online research on the attack location, which could be indicated on that person's computer.

## VI.      SEARCH AND SEIZURE OF NON-ELECTRONIC MEDIA

29. This application seeks permission to search for and seize evidence and instrumentalities concerning a violation of 18 U.S.C. § 875(c), based on the facts set forth in this affidavit at the location described in Attachment A. These items are detailed in Attachment B. In general, these items are evidence of Cebula's intention to visit Blizzard's headquarters with weapons and to sexually assault young girls at Disneyland and elsewhere. These items will consist of weapons and documents, such as writings and photographs, evidencing intent, planning, and consideration of carrying out the actions in Cebula's statements.

## VII.   SEARCH AND SEIZURE OF ELECTRONIC MEDIA

30.   This application seeks also permission to search for and seize evidence and instrumentalities concerning a violation of 18 U.S.C. § 875(c), on electronic and digital devices (collectively, the "Digital Devices").

31.   I have spoken with FBI Information Technology Specialist and Computer Forensic Examiner Alan Russell Schmidt ("FE Schmidt"), who has been a Forensic Examiner since 2006.   FE Schmidt is specially trained in computer search-and-seizure, and is certified by the FBI as a member of the FBI Computer Analysis Response Team ("CART").   FE Schmidt has been a member of CART since 2005 and has conducted numerous searches and seizures involving computers and computer data.   FE Schmidt related information to me and/or confirmed information for me as noted below.

32.   Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices including FE Schmidt, I know that data in digital form can be stored on a variety of systems, storage devices, or media, including hard disk drives, floppy disks, compact disks, magnetic tapes, flash drives, and memory chips.   Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

33.   Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, including FE Schmidt, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information.   I know that it is common for individuals to have personal computers and to use these computers to conduct their personal affairs, their business affairs, and to store information related thereto.

### Removal of Data Storage Devices for Review in a Laboratory Setting May Be Required

34.   Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices including FE Schmidt, I know that a forensic image is an exact physical copy of a data storage device.   A forensic image captures all data on the subject media without viewing or changing the data in any way.   Absent

unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search

of data for information subject to seizure pursuant to the warrant.  I also know that during the search

of the premises it is not always possible to create a forensic image of or search digital devices or

media for data.  I also know that it is frequently necessary to remove digital devices or media for later

laboratory evaluation off-site under controlled circumstances.  This is true for a number of reasons,

including the following:

    a.  Searching digital devices can be a highly technical process that requires specific expertise

and specialized equipment.  Because there are so many different types of digital devices

and software in use today, it is difficult to anticipate all of the necessary technical

manuals, specialized equipment, and specific expertise necessary to conduct a thorough

search of the media to ensure that the data will be preserved and evaluated in a useful

manner.

    b.  Searching digital devices can require the use of precise, scientific procedures designed to

maintain the integrity of the evidence.  The recovery of such data may require the use of

special software and procedures, such as those used in a law enforcement laboratory.

    c.  The volume of data stored on many digital devices is typically so large that it will be

highly impractical to search for data during the execution of the physical search of the

premises.  Storage devices capable of storing terabytes of data are now commonplace.  It

can take several hours, or even days, to image a single hard drive.  The larger the drive,

the longer it takes.  Depending upon the number and size of the devices, the length of

time that agents must remain onsite to image and examine digital devices can become

impractical.

    d.  Since digital data may be vulnerable to inadvertent modification or destruction, a

controlled environment, such as a law enforcement laboratory, may be essential to

conduct a complete and accurate analysis of the digital devices from which the data will

be extracted. Software used in a laboratory setting can often reveal the true nature of

data.  Moreover, a computer forensic reviewer needs a substantial amount of time to

extract and sort through data that is concealed or encrypted to determine whether it is

1            evidence, contraband, or an instrumentality of a crime.

2      e.  Analyzing the contents of a computer or other electronic storage device, even without

3           significant technical difficulties, can be very challenging, and a variety of search and

4           analytical methods must be used. For example, searching by keywords, which is a

5           limited text-based search, often yields thousands of hits, each of which must be

6           reviewed in its context by the examiner to determine whether the data is within the

7           scope of the warrant. Merely finding a relevant hit does not end the review process.

8           The computer may have stored information about the data at issue which may not be

9           searchable text, such as: who created it; when and how it was created, downloaded, or

10          copied; when it was last accessed; when it was last modified; when it was last printed;

11          and when it was deleted. The relevance of this kind of data is often contextual.

12          Furthermore, many common email, database, and spreadsheet applications do not store

13          data as searchable text, thereby necessitating additional search procedures. To

14          determine who created, modified, copied, downloaded, transferred, communicated

15          about, deleted, or printed data requires a search of events that occurred on the computer

16          in the time periods surrounding activity regarding the relevant data. Information about

17          which users logged in, whether users shared passwords, whether a computer was

18          connected to other computers or networks, and whether the users accessed or used other

19          programs or services in the relevant time period, can help determine who was sitting at

20          the keyboard.

21      f.  Searching digital devices can require the use of precise, scientific procedures designed to

22          recover latent data. The recovery of such data may require the use of special software

23          and procedures. Data that represents electronic files or remnants of such files can be

24          recovered months or even years after it has been downloaded onto a hard drive, deleted,

25          or viewed via the Internet. Even when such files have been deleted, data can be

26          recovered months or years later using readily available forensic tools. Normally, when a

27          person deletes a file on a computer, the data contained in the file does not actually

28          disappear; rather, that data remains on the hard drive until it is overwritten by new data.

1  Therefore, deleted files, or remnants of deleted files, may reside in space on the hard

2  drive or other storage media that is not allocated to an active file.  In addition, a

3  computer's operating system may keep a record of deleted data in a swap or recovery

4  file or in a program specifically designed to restore the computer's settings in the event

5  of a system failure.

6  35.  This warrant application seeks authority to seize contextual data, that is, evidence of how

7  a digital device has been used, what it has been used for and who has used it.  It can be very

8  important in criminal cases to seek "attribution" data so that an event or communication can be

9  associated with a person.  Based upon my training and experience, and information related to me by

10  agents and others involved in the forensic examination of computers and digital devices including FE

11  Schmidt, this authority is sought for a number of reasons:

12  a.  In some instances, the computer "writes" to storage media without the specific

13  knowledge or permission of the user.  Generally, data or files that have been received

14  via the Internet are automatically downloaded into a temporary Internet directory or

15  cache.  The browser typically maintains a fixed amount of hard drive space devoted to

16  such data or files, and the files are only overwritten as they are replaced with more

17  recently viewed Internet pages.  Thus, the ability to retrieve artifacts of electronic

18  activity from a hard drive depends less on when the file was downloaded or viewed than

19  on a particular user's operating system, storage capacity, and computer usage.  Logs of

20  access to websites, file management/transfer programs, firewall permissions, and other

21  data assist the examiner and investigators in creating a "picture" of what the computer

22  was doing and how it was being used during the relevant time in question.  Given the

23  interrelationships of the data to various parts of the computer's operation, this

24  information cannot be easily segregated.

25  b.  Digital data on the hard drive that is not currently associated with any file may reveal

26  evidence of a file that was once on the hard drive but has since been deleted or edited, or

27  it could reveal a deleted portion of a file (such as a paragraph that has been deleted from

28  a word processing file). Virtual memory paging systems can leave digital data on the

hard drive that show what tasks and processes on the computer were recently used. Web browsers, email programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

c.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

### Search Procedure

36.   In searching for data capable of being read, stored, or interpreted by a computer or storage device, law enforcement personnel executing the search warrant will employ the following procedure:

AFFIDAVIT OF BRADY H. COWAN                    14

a.  The digital device will be transported to an appropriate law enforcement laboratory for review.

b.  Law enforcement personnel (potentially including, but not necessarily limited to, computer personnel) will examine the digital device to determine if it contains any data that falls within the list of items to be seized as set forth in the warrant and in Attachment B.

c.  Law enforcement personnel will use procedures designed to identify items to be seized under the warrant. These procedures may include, without limitation, the use of a "hash value" library to exclude normal operating system files that do not need to be searched. In addition, law enforcement personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data falls within the list of items to be seized under the warrant.

d.  If the original digital device was seized, law enforcement personnel will perform an initial search of the original digital device within a reasonable amount of time not to exceed 120 days from the date of execution of the warrant. If, after conducting the initial search, law enforcement personnel determine that an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, the government will retain the original digital device to, among other things, litigate the admissibility or authenticity of the seized items at trial, ensure the integrity of the copies, ensure the adequacy of chain of custody, and resolve any issues that potentially might be raised regarding changed conditions of the evidence. If the government needs additional time to determine whether an original digital device contains any data falling within the list of items to be seized pursuant to this warrant, it may seek an extension of the time period from the Court within the original 120-day period from the date of execution of the warrant.

e.  If an original digital device does not contain any data falling within the list of items to be seized pursuant to this warrant, the government will: return that original digital device to its owner within a reasonable period of time if it can be lawfully possessed,

1   seal any image previously made of the device, and not review the sealed image absent

2   further authorization from the Court.

3   ### Data to be Seized

4   37.  Based upon my training and experience, and information related to me by agents and

5   others involved in the forensic examination of computers and digital devices, I know that, in order to

6   search for data that is capable of being read or interpreted by a computer, law enforcement personnel

7   will need to seize, image, copy, and/or search the following items, subject to the procedures set forth

8   herein:

9   a.  Any computer equipment or digital devices that are capable of being used to commit or

10  further the crimes outlined above, or to create, access, or store evidence, contraband,

11  fruits, or instrumentalities of such crimes, as set forth in Attachment B;

12  b.  Any router used to access the internet;

13  c.  Any computer equipment or digital devices used to facilitate the transmission, creation,

14  display, encoding, or storage of data, including word processing equipment, modems,

15  docking stations, monitors, printers, plotters, encryption devices, and optical scanners

16  that are capable of being used to commit or further the crimes outlined above, or to

17  create, access, process, or store evidence, contraband, fruits, or instrumentalities of such

18  crimes, as set forth in Attachment B;

19  d.  Any magnetic, electronic, or optical storage device capable of storing data, such as

20  floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks,

21  printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers,

22  electronic notebooks, personal digital assistants, and cell phones capable of being used

23  to commit or further the crimes outlined above, or to create, access, or store evidence,

24  contraband, fruits, or instrumentalities of such crimes, as set forth in Attachment B;

25  e.  Any documentation, operating logs, and reference manuals regarding the operation of

26  the computer equipment, storage devices, or software;

27  f.  Any applications, utility programs, compilers, interpreters, and other software used to

28  facilitate direct or indirect communication with the computer hardware, storage devices,

1    or data to be searched;

2    g.  Any physical keys, encryption devices, dongles, or similar physical items which are

3        necessary to gain access to the computer equipment, storage devices, or data;

4    h.  Any passwords, password files, test keys, encryption codes, or other information

5        necessary to access the computer equipment, storage devices, or data; and

6    i.  All records, documents, programs, applications, or materials created, modified, or stored

7        in any form, including in digital form, on any computer or digital device, that show the

8        actual user(s) of the computers or digital devices during any time period in which the

9        device was used to commit the crimes referenced above, including the web browser's

10       history; temporary Internet files; cookies, bookmarked, or favorite web pages; email

11       addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by

12       the computer; email, instant messages, and other electronic communications; address

13       books; contact lists; records of social networking and online service usage; and software

14       that would allow others to control the digital device such as viruses, Trojan horses, and

15       other forms of malicious software (or alternatively, the lack of software that would allow

16       others to control the digital device);

17   j.  All records, documents, programs, applications, or materials created, modified, or stored

18       in any form, including in digital form, on any computer or digital device, that show

19       evidence of counter-forensic programs (and associated data) that are designed to

20       eliminate data from the computer or digital device;

21   k.  All records, documents, programs, applications, or materials created, modified, or stored

22       in any form, including in digital form, on any computer or digital device, that show

23       contextual information necessary to understand the evidence, contraband, fruits, or

24       instrumentalities described in this attachment.

25                              **Retention of Image**

26       38.  The government will retain a forensic image of each digital device subjected to analysis

27   for a number of reasons, including proving the authenticity of evidence to be used at trial; responding

28   to any potential questions regarding the corruption of data; establishing the chain of custody of data;

refuting any potential claims of fabrication, tampering, or destruction with/of data; and addressing potential exculpatory evidence claims where, for example, a defendant claims that the government avoided its obligations by destroying data or returning it to a third party.

**Inventory and Return**

39.  With respect to the seizure of electronic storage media or the seizure or imaging of electronically stored information, the search warrant return to the Court will describe the physical storage media that were seized or imaged.

## VIII.    REQUEST FOR SEALING

40.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## IX.    **CONCLUSION**

41.  Based on my training, experience and discussions with other Special Agents, as well as the evidence set forth in this affidavit, I believe probable cause exists to believe that Cebula has transmitted statements constituting threatening internet communications, in interstate commerce, from the Subject Residence, in violation of 18 U.S.C. § 875(c).  Furthermore, I believe there is probable cause that evidence and instrumentalities, as more fully described in Attachment B, will be found at the places defined in Attachments A.   Therefore, I respectfully request the issuance of a search warrant for evidence and instrumentalities of violations of 18 U.S.C. § 875(c).

42.  I swear under penalty and perjury that the foregoing information is true and correct to the best of my knowledge, information, and belief.


Brady H. Cowan
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me this _11th_ day of July, 2016.


The Honorable Carolyn K. Delaney
United States Magistrate Judge


Approved as to form:


Owen Roth
Assistant United States Attorney

AFFIDAVIT OF BRADY H. COWAN                          19

**Attachment A**

LOCATION TO BE SEARCHED:  The residence is located at 3225 Panama Avenue, Carmichael, California, 95608.

The residence is a one story home located on the north side of Panama Avenue.  The roof is comprised of grey tile.  A white metal overhang extends from the roof to the driveway.  The exterior walls are white, with bricks making up the bottom portion of the exterior wall.  There are two doors on the south side of the residence, each with a white security gate.  A white mailbox is positioned on the east side of the driveway, with the numbers "3225" displayed in black.  The driveway is on the western portion of the property and the eastern portion of the property contains an unfenced front yard.  The western section of the home is offset to north and appears to have once been a garage, likely converted into a bedroom.



**Attachment B**

ITEMS TO BE SEIZED:  Evidence and instrumentalities of violations of 18 U.S.C. § 875(c):

a.  Indicia of residency or control of the Subject Residence as described in Attachment A, by Cebula, Gail Cebula, and Cebula's sister and his sisters' children;

b.  Any physical or electronic records of threats made to Blizzard Entertainment, Disneyland, children, or others, such as writings by Cebula, documents in Cebula's possession or control concerning the means and manner of making and carrying out such threats, and preparation for carrying out such threats;

c.  Any weapon capable of committing the attacks described in the affidavit, including, but not limited to, AK-47 or other assault rifles, explosives, or other firearms or incendiary devices;

d.  Any physical or electronic records concerning the sexual assault of young children, including but not limited to electronic or non-electronic images depicting the sexual assault of young children and any documents describing such assaults or describing the means and manner of carrying them out, whether created by Cebula or any another person, and concerning preparation for carrying out such assaults;

e.  Any electronic-storage device including all thumb drives, laptops, computer tablets, external computer storage hard drives, data CD ROMs, data DVDs, smart phones, and external computer-storage devices;

f.  All electronic devices connecting any electronic media to the internet by means of an internet-protocol address, including by not limited to routers and devices performing a similar function;

g.  Computer hardware, electronic devices, software, documentation, passwords, and/or data security devices related thereto:

   1.  Computers, software, peripheral data storage devices, that may contain the items listed in this attachment, and all other equipment/material/programs needed to review the contents of the computer (with law enforcement allowed to take the computer and related material for off-site inspection and allowed 120 days from the day of the search to examine the content of computer and related equipment to determine whether it contains items to be seized – unless extended by order of court).

2. Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes referenced above, or to create, access, process, or store evidence, contraband, fruits, or instrumentalities of such crimes;

3. Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes referenced above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes;

4. Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

5. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched, to include internet modems;

6. Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

7. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data; and

8. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) or owners of the computers or digital devices during the time the device was utilized to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; email addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; email, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control

the digital device such as viruses, Trojan horses, and other forms of malicious software (or alternatively, the lack of software that would allow others to control the digital device).

9. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device.

10. All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual information necessary to understand the evidence and instrumentalities described in this attachment.

11. All evidence called for in other portions of this attachment that might be stored, created, recorded, or maintained in digital format.

# **Appendix A**

| | | |
|---|---|---|
| 7/3/2016 0:45 | 83054414#1 | Sup you fucking nigger cunt slaves. I swear to you if I find you when I try to hack into your profiles, I will rape your children regardless of age. If we win, I will leave you all alone after I rape them. If not, their throats meet my blade. Let's win. |
| 7/3/2016 0:45 | 83054414#1 | I will fill whatever you stupid niggers need. |
| 7/3/2016 0:46 | 83054414#1 | Shutup nigger. I will tell you when to speak, slave. |
| 7/3/2016 0:47 | 83054414#1 | Yeah ya dumb nigger. |
| 7/3/2016 0:47 | 83054414#1 | way to pay attention. Go back to cotton picking. |
| 7/3/2016 0:47 | 83054414#1 | i hate you all. You make me want to shoot up an elementary school. |
| 7/3/2016 0:48 | 83054414#1 | I will thank you when I stick my dick into your 5 year old girl. |
| 7/3/2016 0:48 | 83054414#1 | If you do not have one, I will wait until you do. |
| | | |
| 7/3/2016 0:27 | 52309668#1 | HE GOT TWILIGHT DREAM |
| 7/3/2016 0:27 | 52309668#1 | god dammit |
| 7/3/2016 0:27 | 52309668#1 | no |
| 7/3/2016 0:27 | 52309668#1 | because im dead too fast |
| 7/3/2016 0:27 | 52309668#1 | because malf isnt a HEALER Spec |
| 7/3/2016 0:27 | 83054414#1 | yeah. we do not have a chance. let them win. |
| 7/3/2016 0:27 | 52309668#1 | to extend my lose stream |
| 7/3/2016 0:28 | 52309668#1 | hes a tool |
| 7/3/2016 0:28 | 83054414#1 | I almost always go damage build. It usually kicks ass. |
| 7/3/2016 0:28 | 83054414#1 | Wulfgar, do not be a noob child. Get over it. you win you lose. |
| 7/3/2016 0:29 | 52309668#1 | no we wont |
| 7/3/2016 0:29 | 52309668#1 | watcgh |
| 7/3/2016 0:29 | 52309668#1 | ium gonna win this fucking game |
| 7/3/2016 0:29 | 83054414#1 | Lol of course. reporting all of you noobs. |
| 7/3/2016 0:29 | 52309668#1 | report a win |

| | | |
|---|---|---|
| 7/3/2016 0:29 | 52309668#1 | ty' |
| 7/3/2016 0:29 | 52309668#1 | group |
| 7/3/2016 0:29 | 83054414#1 | down almost 3 levels. win? no chance. |
| 7/3/2016 0:29 | 52309668#1 | bacjk uo |
| 7/3/2016 0:29 | 52309668#1 | listen to my pings we win |
| 7/3/2016 0:29 | 83054414#1 | lmao. sure we do, child. |
| 7/3/2016 0:30 | 52309668#1 | FOLLOW THE PINGS AND THATS 2 KILLS |
| 7/3/2016 0:30 | 83054414#1 | You mad bro? hahahaha |
| 7/3/2016 0:30 | 52309668#1 | yes im mad |
| 7/3/2016 0:30 | 52309668#1 | you dumbass |
| 7/3/2016 0:30 | 83054414#1 | good |
| 7/3/2016 0:30 | 52309668#1 | youre losing us the game and why |
| 7/3/2016 0:30 | 83054414#1 | you do not deserve happiness. |
| 7/3/2016 0:30 | 52309668#1 | because youre a fucking loser |
| 7/3/2016 0:30 | 52309668#1 | dude |
| 7/3/2016 0:30 | 52309668#1 | im tripping balls |
| 7/3/2016 0:30 | 83054414#1 | That's right child. get it all out. |
| 7/3/2016 0:31 | 52309668#1 | im going to leave this game, have a smoke, then LOVE MY DAY |
| 7/3/2016 0:31 | 52309668#1 | you mean NOTHING TO ME |
| 7/3/2016 0:31 | 52309668#1 | except that you suck dick at the game |
| 7/3/2016 0:31 | 52309668#1 | AND that we winwithout you |
| 7/3/2016 0:31 | 83054414#1 | hahahah wulfgar is mad. He is raging now. it is so cute. |
| 7/3/2016 0:32 | 52309668#1 | everyone rport malf |
| 7/3/2016 0:32 | 52309668#1 | and his 23k support and toxic attitude |
| 7/3/2016 0:32 | 52309668#1 | 3 day ban if you all do |
| 7/3/2016 0:32 | 83054414#1 | Seb, that is not even creative bro. If you are going to troll, child, come up with something other than orginigal. |
| 7/3/2016 0:32 | 83054414#1 | I have been reported at least 15 times in the past 3 days. I am not getting silenced, noob. |
| 7/3/2016 0:32 | 52309668#1 | lets see |
| 7/3/2016 0:32 | 83054414#1 | hahahaha you suck wulfgar. Get mad bro. You suck noob. |
| 7/3/2016 0:33 | 52309668#1 | i did |
| 7/3/2016 0:33 | 83054414#1 | all you can do is rage, child. That is why you fail in life. |
| 7/3/2016 0:33 | 52309668#1 | im calm |
| 7/3/2016 0:33 | 52309668#1 | you equate caps to raging, which is laughable |
| 7/3/2016 0:33 | 83054414#1 | Keep telling yourself that. Maybe it will work for you. |
| 7/3/2016 0:33 | 52309668#1 | report him afk |
| 7/3/2016 0:33 | 52309668#1 | guys just report him |
| 7/3/2016 0:34 | 52309668#1 | he neeeds a ban |
| 7/3/2016 0:34 | 83054414#1 | Compared to you and noob sonya, I am a god. |
| 7/3/2016 0:34 | 52309668#1 | the god of the rez area |
| 7/3/2016 0:34 | 52309668#1 | everyone bow down |
| 7/3/2016 0:34 | 83054414#1 | If it makes you feel important child, rage at me some more. Come on wulfgar. You are on a losing streak. THat is because yo uare an impotent child. |
| 7/3/2016 0:34 | 52309668#1 | was that a PARAGRAPH |
| 7/3/2016 0:34 | 52309668#1 | in HOTS!? |

| | | |
|---|---|---|
| 7/3/2016 0:34 | 83054414#1 | Lol. Noob. |
| 7/3/2016 0:35 | 83054414#1 | I am glad you lost. You do not deserve it. =) |
| 7/3/2016 0:35 | 83054414#1 | I win in the end. I win if you lose. Checkmate, bitch. =) |
| 7/3/2016 0:35 | 52309668#1 | thats the WORST logic |
| 7/3/2016 0:35 | 52309668#1 | literally |
| 7/3/2016 0:35 | 52309668#1 | ive ever heard |
| 7/3/2016 0:35 | 83054414#1 | hahahaha. your losing streak continues, child. hahahahaha |
| 7/3/2016 0:35 | 52309668#1 | like if you told a DOC that, theyd put you in the hospital |
| 7/3/2016 0:35 | 83054414#1 | reporting and muting you after game, noob. |
| 7/3/2016 0:35 | 52309668#1 | kind of crazy shit |
| 7/3/2016 0:35 | 83054414#1 | hahahahaha |
| 7/3/2016 0:36 | 52309668#1 | wtf just happened |
| 7/3/2016 0:36 | 52309668#1 | still tripping btw |
| 7/3/2016 0:36 | 52309668#1 | soooo |
| 7/3/2016 0:36 | 52309668#1 | confused |
| 7/3/2016 0:36 | 52309668#1 | very confused |
| 7/3/2016 0:36 | 83054414#1 | Tell me where you live nigger, and if you are near me, I will kill you. |
| 7/3/2016 0:36 | 83054414#1 | Come on coward. I challenge you to a fight to the death. |
| 7/3/2016 0:36 | 83054414#1 | Come at me. |
| 7/3/2016 0:36 | 52309668#1 | how do i take a screenshot |
| 7/3/2016 0:36 | 52309668#1 | fast |
| 7/3/2016 0:36 | 83054414#1 | It would be worth the jail time to rid this world from a piece of shit like you. |
| 7/3/2016 0:37 | 83054414#1 | Come on coward. |
| 7/3/2016 0:37 | 83054414#1 | That's right dog, fear me. I am a god and you are an ant beneath my boot. |
| 7/3/2016 0:37 | 52309668#1 | screenshotted that, im gonna tweet it to hots and blizzard |
| 7/3/2016 0:37 | 52309668#1 | you nutcase |
| 7/3/2016 0:37 | 83054414#1 | Thank you. This has been very entertaining. |
| 7/3/2016 0:38 | 83054414#1 | Screen shot this. Something bad may or may not happen to the blizzard headquarters here in california. |
| | | |
| 7/2/2016 7:16 | 83054414#1 | You guys suck. Killafroggy you noob. You could have killed nazeebo right there. |
| 7/2/2016 7:17 | 83054414#1 | stop chasingg you idiot. |
| 7/2/2016 7:17 | 83054414#1 | You could have done it quicker and moved onto a new hero... |
| 7/2/2016 7:17 | 83054414#1 | You suck worse than me nigger. I will kill your family bitchI. |
| 7/2/2016 7:18 | 83054414#1 | I will rape any low age daughters you have then slit their throat bitch. |
| 7/2/2016 7:18 | 66400480#1 | gg |
| 7/2/2016 7:19 | 83054414#1 | fuck you niggers. I will kill all of you. |
| 7/2/2016 7:19 | 83054414#1 | Tonight, a little girl might get a dick in her because of you nigger slaves. |
| 7/2/2016 7:19 | 83054414#1 | It is your fault. Not mine. |
| 7/2/2016 7:19 | 83054414#1 | I will bomb the new york twin towers. |
| 7/2/2016 7:19 | 83054414#1 | I will kill all the children in disneyland. |

| | | |
|---|---|---|
| 7/2/2016 7:19 | 83054414#1 | I swear it. |
| 7/2/2016 7:20 | 83054414#1 | I hate you all. I hate everyone. |
| 7/2/2016 7:22 | 83054414#1 | Hey niggers. I am going to rape a little girl in the bathroom at Disneyland. Let's win this so I can go to bed feeling like the god I am. |
| 7/2/2016 7:23 | 83054414#1 | Or we can lose and I can slit her throat and shove her into the toilet after I am done with her. |
| | | |
| 7/2/2016 7:08 | 751292#1 | i see this as loss already..... |
| 7/2/2016 7:11 | 751292#1 | why... |
| 7/2/2016 7:13 | 751292#1 | stop feeding plz |
| 7/2/2016 7:13 | 751292#1 | team |
| 7/2/2016 7:13 | 751292#1 | dont chase wtf |
| 7/2/2016 7:14 | 751292#1 | objective |
| 7/2/2016 7:14 | 751292#1 | yup we lost this team.... |
| 7/2/2016 7:15 | 751292#1 | gg |
| 7/2/2016 7:15 | 751292#1 | gona report already |
| 7/2/2016 7:16 | 751292#1 | idk how any of u r silver |
| 7/2/2016 7:16 | 83054414#1 | You guys suck. Killafroggy you noob. You could have killed nazeebo right there. |
| 7/2/2016 7:17 | 83054414#1 | stop chasingg you idiot. |
| 7/2/2016 7:17 | 83054414#1 | You could have done it quicker and moved onto a new hero... |
| 7/2/2016 7:17 | 83054414#1 | You suck worse than me nigger. I will kill your family bitchl. |
| 7/2/2016 7:17 | 751292#1 | fal reported |
| 7/2/2016 7:18 | 83054414#1 | I will rape any low age daughters you have then slit their throat bitch. |
| 7/2/2016 7:19 | 83054414#1 | fuck you niggers. I will kill all of you. |
| 7/2/2016 7:19 | 83054414#1 | Tonight, a little girl might get a dick in her because of you nigger slaves. |
| 7/2/2016 7:19 | 751292#1 | gl with ban |
| 7/2/2016 7:19 | 83054414#1 | It is your fault. Not mine. |
| 7/2/2016 7:19 | 83054414#1 | I will bomb the new york twin towers. |
| 7/2/2016 7:19 | 83054414#1 | I will kill all the children in disneyland. |
| 7/2/2016 7:19 | 83054414#1 | I swear it. |
| 7/2/2016 7:20 | 751292#1 | now i hope ui go to jail |
| 7/2/2016 7:20 | 83054414#1 | I hate you all. I hate everyone. |
| | | |
| 7/2/2016 7:11 | 323299160#1 | fal |
| 7/2/2016 7:13 | 323299160#1 | gotta stay back sly |
| 7/2/2016 7:16 | 83054414#1 | You guys suck. Killafroggy you noob. You could have killed nazeebo right there. |
| 7/2/2016 7:17 | 323299160#1 | uhm? |
| 7/2/2016 7:17 | 83054414#1 | stop chasingg you idiot. |

| 7/2/2016 7:17 | 323299160#1 | i did? |
|---|---|---|
| 7/2/2016 7:17 | 83054414#1 | You could have done it quicker and moved onto a new hero... |
| 7/2/2016 7:17 | 323299160#1 | as a dps u kinda suck m8 :) |
| 7/2/2016 7:17 | 83054414#1 | You suck worse than me nigger. I will kill your family bitchl. |
| 7/2/2016 7:18 | 83054414#1 | I will rape any low age daughters you have then slit their throat bitch. |
| 7/2/2016 7:18 | 323299160#1 | reported |
| 7/2/2016 7:19 | 83054414#1 | fuck you niggers. I will kill all of you. |
| 7/2/2016 7:19 | 83054414#1 | Tonight, a little girl might get a dick in her because of you nigger slaves. |
| 7/2/2016 7:19 | 83054414#1 | It is your fault. Not mine. |
| 7/2/2016 7:19 | 83054414#1 | I will bomb the new york twin towers. |
| 7/2/2016 7:19 | 83054414#1 | I will kill all the children in disneyland. |
| 7/2/2016 7:19 | 83054414#1 | I swear it. |
| 7/2/2016 7:20 | 83054414#1 | I hate you all. I hate everyone. |